## Case No. 11,917.

### ROBERTS v. SKOLFIELD et al.

[3 Ware, 184;[1] 8 Am. Law Reg. 156.]

District Court, D. Maine. Sept., 1858.

PLEADING IN ADMIRALTY—TORTS—JOINDER—CONSTITUTIONAL LAW—MARITIME LAW — POWER TO REGULATE COMMERCE — SEAMEN — ACTION FOR PERSONAL INJURIES.

1. An action for a joint tort against two or more cannot, in the admiralty, be united with a tort against one separately, if the objection be taken.

2. The general maritime law was adopted by the constitution of the United States, and no state can have a separate and distinct maritime law by itself.

3. This law governs the crews of the vessels of the United States. wherever they go, whether in a port of the Union, or in a foreign port.

4. When the constitution adopts the admiralty and maritime jurisdiction, it adopts also the law by which it is governed.

5. The power of the United States to govern seamen, may also be derived from the commercial power. The power to regulate commerce includes that of navigation.

6. When a seaman engages in a commercial adventure. the laws of the United States follow him until the voyage is completed, whether in a foreign country, or the Union.

7. The commerce of the country is a unity, and wherever it goes it is governed and protected by the laws of the United States.

In admiralty.

Gen. Fessenden and D. W. Fessenden, for libellant.

Shepley & Dana, for respondents.

WARE, District Judge. This is a libel against J. L. Skolfield, master, and W. C. Fairfield. mate of the ship John W. Dimmich, jointly, in a cause of damage. The libellant shipped to Portland, Nov. 6, 1857, for a voyage to Mobile, thence to Europe, and back to the United States. After the ship arrived at Mobile, she remained there about four months, waiting for a cargo, and while lying in the bay, at the distance of several miles from the city, on the 12th of January the events happened which are the subject of this libel. In the morning of that day, Roberts was employed in calking the forecastle, Fairfield, the mate, being near him. Roberts asked the mate for a calking mallet. The mate told him to work with a serving mallet, which he had in his hand; and Roberts replied that he could not work so well with that as with a calking mallet. More words, it seems, must have passed between them, for as Roberts got up, the mate struck him a pretty hard blow on his arm with the mallet which he had in his own hand. The noise attracted the attention of the master, who was on the after part of the deck, and he immediately came forward, with the master of another vessel in port, who happened to be on board. They both fell on Roberts, the mate standing by. The captain knocked

[1] [Reported by George F. Emery, Esq.]

him down with his fist, and they both seized him by the hair or collar, as often as he attempted to rise, and threw him down again; and continued for some time striking and kicking him on his head, face and shoulders, as he lay or attempted to rise. The boy Lewis, who was at work near, and saw the whole affair, says that they booted him all around the forecastle. Smith, also, the boatswain, who was near and saw most of the affray, says that as often as Roberts attempted to get up, they seized him by the hair and pulled; him down, and repeated their blows with their hands and feet. The boatswain also confirms the testimony of Lewis, that when they had done beating him, the captain, as he went aft, told the mate that if the men gave him more of their sauce, to take a handspike, and hit them on the head. This is also stated by some of the rest of the crew. The captain soon after left the ship, and Roberts, as he continued his work, notwithstanding the beating and booting, asked the boy Lewis to bring him some oakum. The mate told Lewis not to go, and to let Roberts get it himself. Roberts went, and as he was returning with it, the mate met him. and took from his pocket a slung-shot, and struck two blows with it in his face, and one on the back of his head. These blows were given with such violence that severe wounds were made on the face and back part of his head, from which blood flowed so freely as to run down on the deck, and make a considerable puddle. Lewis, who was near, thought there was nearly a quart. The description given by Smith, the boatswain, rather confirms that of the boy. Roberts wiped the blood from the deck with his shirt, which has been exhibited in court, and identified by the witnesses. It was saturated with blood, and shows that there could not have been much exaggeration by the witnesses. The blood continued for two days to ooze from the wound made on his nose. Roberts continued for several days to complain of pain in his head, and kept his head bound up with a handkerchief.

In a separate article the libel sets forth another tort committed by the master during the same voyage, in the port of Havre, in which the mate had no part. The counsel for the respondent objects to the union in the same libel of a joint action against two, with an allegation of a separate tort committed by one of the parties, and on this ground he moves that the libel be dismissed as multifarious. The like objection is made to the third article of the libel for the second assault of the mate in Mobile, being after the captain had left the ship. The article for the tort in Havre does, in my opinion, render the libel open to the objection of multifariousness. But it does not follow that the libel must be dismissed. That article may be struck out by an amendment, and the libellant proceed in the suit for the joint wrong of the two. For the second assault at Mobile

by the mate, after what had taken place the same morning and but an hour before, my opinion is that the master cannot be exempted from the responsibility: He left orders, that if any further difficulty occurred, for the mate to put an end to it with a handspike. The mate, instead of using this instrument, took from his pocket a slung-shot. Either mode of punishment was illegal, and the mate might fairly infer that, by directing one the master authorized the other. If this assault with a slung-shot was unjustifiable, I think the master ought to be jointly responsible for it. Elwell v. Martin [Case No. 4,-425]; Pratt v. Thomas [Id. 11,377].

But another objection is made, which goes to the whole libel, and requires a more detailed and deliberate consideration. This is, that the subject matter of the libel is not within the admiralty jurisdiction. The assault at Mobile, it is said, was committed while the ship was lying within the body of a county, in the state of Alabama, and thus was without the jurisdiction of this court. The objection, put into a more general formula, is that the admiralty has no jurisdiction over a tort committed by one of the ship's company against another on board the ship in matters relating to the police of the ship, and in the maintenance of discipline while the ship is lying in a port of the United States, within the body of a county. As a matter of fact it may be doubted whether the ship was within the limits of a county. But waiving this, and taking the objection in its most general form, it involves a question of great importance to the commerce of the country. The jurisdiction of the admiralty, in matters of tort, depends on the locality of the act, and the question, which this case raises is, whether the navigable waters in the ports and harbors of the United States are within the admiralty and maritime jurisdiction granted by the constitution. It may be admitted that the common-law courts of England would prohibit the high court of admiralty from taking cognizance of such a case. But the admiralty jurisdiction of this court is derived from our own constitution; and it appears to me to have been too long settled to be now brought into doubt; that it is more extensive than that allowed by the court of king's bench to the high court of admiralty in England, both in matters of contract and tort, where it is determined by the locality of the act. The judiciary act [1 Stat. 73] passed by the first congress that sat under the constitution assigned to the admiralty jurisdiction over all cases of seizures made under laws of impost and navigation on waters navigable from the sea by vessels of ten or more tons burthen, as well as upon the high seas, without regard to county lines. For it can hardly be necessary to remark, that such waters in harbors, creeks, and rivers, are by the common law included within the bodies of counties. In the case of The Vengeance, 3 Dall. [3 U.

S.] 297, and in that of The Betsey and Charlotte, 4 Cranch [8 U. S.] 443, the constitutionality of this act was brought into controversy. The whole subject was exhausted by the elaborate argument of the claimant's counsel in the latter case, and the court unanimously reaffirmed their former decision, and have since steadily adhered to it.

We have thus the decision of all the departments of the government, the legislative, executive, and judicial, that the admiralty jurisdiction does extend to waters navigable from the sea by vessels of ten or more tons burthen, and is not excluded by the fact that those waters are within the body of a county. It may be said that the case of The Vengeance, and those which followed it, apply only to revenue seizures. But if revenue seizures within these waters are rightfully put on the admiralty side of the court, no good reason is perceived why torts committed on board American vessels in the same waters, are not subject to the cognizance of the same courts. Indeed, this has been so often decided in cases of collision, taking place in harbors and rivers, that it would seem at this day quite too late to call it in question. It does not seem to be necessary on this point to do more than to refer to the single case of Jackson v. The Magnolia, 20 How. [61 U. S.] 296, decided at the last term of the supreme court. That was a collision that took place in the river Alabama, about two hundred miles above tide water; and yet it was held by all the judges except two, that it was clearly within the admiralty jurisdiction.

In such navigable waters, included within the limits of a county, the admiralty has a concurrent jurisdiction with the common-law courts, and one or the other may take cognizance of a case according to the subject-matter, whether it is of a terrene or maritime nature, and perhaps, also, according to the occupations of the parties, whether their engagements and employments are on the land or the sea. It is by these distinctions that it is to be determined what law applies and governs the case; whether that of the land or sea. If the cases are governed by the maritime, the admiralty is the proper court to administer that law, and takes the jurisdiction. If the rights of the parties are to be determined by the local law of the place, then the jurisdiction properly belongs to those courts. In the case of the Magnolia's collision, by what court is it to be determined which vessel was in fault? They met in a common highway, where each had equal rights subject to the law. That directed how they should pass each other, whether to the right or the left, and what other measures each was bound to take to avoid a collision. Was this the law of navigation, the maritime law, the same that was their guide at sea, or was it the highway laws of Alabama? When the question is stated in this way it seems to answer itself. It is the law of navigation, the maritime law that governs the

case; and this is the law of the United States and not of any particular state. When the constitution declared that the judicial power of the United States should extend to all cases of admiralty and maritime jurisdiction, this grant of judicial power carried with it ex necessitate rei the law by which the jurisdiction should be regulated and governed, and thus the maritime law became exclusively the law of the United States. No one, I presume, will pretend that the state of New York has a maritime law differing from that of any other state in the Union, or that any state has the power to alter that law, at least to affect the rights of a citizen of any other state, or to have any force in the courts of the United States. If ever a doubt could have existed on this subject, it is answered by the case of The New York v. Rae, 18 How. [59 U. S.] 223. In that case the steamer came in collision with a brig lying at anchor in the harbor, and the owners of the brig libelled her for the damage. One of the points of defence was, that the brig did not have her light suspended at the height of twenty feet from the deck, as required by the law of that state. The court said that, however such a regulation might govern the courts of that state, and be applied to vessels engaged wholly in the interior trade of the state, it was not binding on the courts of the United States, which are governed by the general maritime law, nor would it be applied to vessels engaged in the general commerce of the country, and not exclusively in the interior trade of that state. And the brig having such a light as satisfied the maritime law, the objection was overruled. The principle on which the decision is founded, is, that the maritime law is part and parcel of the laws of the United States, and is the same for the citizens and the ships and vessels of all the states, and not subject to be changed by the local legislation of any particular state.

The doctrine of this decision applies to the case now before the court. This is a libel by a seaman against two of the officers of the ship for an assault in the bay of Mobile, while the ship was lying, as is alleged, within the body of a county. By what law are the rights of the parties to be determined? By the maritime law of the United States, or the local law of Alabama? Under one law the officers have authority to maintain discipline, to enforce a respectful behavior on the part of the crew, and to compel obedience to their orders by moderate and reasonable personal chastisement. Under the common law, which is the law of Alabama, the hirer or employer has no right to compel a hired servant to perform his contract, by blows. Every blow given as punishment would involve the right of action. Suppose an assault to be committed in the harbor of Canton on board of an American vessel, is the case to be tried by the laws of the United States or those of China? These cases admit of but one answer. They are to be decided by the laws of the United States. These laws extend the judicial power to all cases that arise under them, and the jurisdiction must belong to their courts. Whether they be of admiralty or common-law jurisdiction, must depend on the particular circumstances of each case. While the vessel is on the high seas, and until she arrives in port and within the body of a county, the authority of the master in maintaining the police of the vessel, and in enforcing obedience to his orders, is derived from the maritime law. As soon as she passes the line of a county, does that law cease, and the local law take its place? and does the local law furnish the measure of his authority? If the seaman deserts, under the maritime law the master may retake and compel him by force to perform his engagements. Can the employer of a hired servant, under the common law, compel him to execute his contract by stripes and imprisonment? It appears to me that there can be but one conclusion. Either the maritime law governs during the whole engagement, or the law changes in every new port the vessel enters during the voyage. The maritime law follows the ship wherever she goes in the prosecution of her enterprise. It throws over the crew its shield for their protection, and it upholds the officers in the exercise of all their reasonable and just authority. This law, by the force of the grant of admiralty and maritime jurisdiction, is, in my opinion, the law of the United States, may be enforced by their courts, and is not subject to alteration by the several states.

But there is, in my opinion, another element which belongs to this subject, and it is that indicated in the opinion of Judge McLean, in the case of Jackson v. The Magnolia: 'The admiralty and maritime jurisdiction is essentially a commercial power.' 20 How. [61 U. S.] 304. By means of this, and this only, the ship's crew is under a uniform law during the whole period of their engagement, and their duties and responsibilities do not change with every new port they enter. A seaman, by entering a foreign jurisdiction, may render himself amenable to foreign laws, but his duty towards the ship, and the authority of the officers over him, are measured by the laws of the country to which the ship belongs. The constitution grants to congress the power 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' Article 2, § 2. Under this grant the commerce of the country becomes a unity. It is not the commerce of the separate and individual states of Massachusetts and New York, but the commerce of the United States. Gibbons v. Ogden, 9 Wheat. [22 U. S.] 194. In the execution of this power, congress has proceeded to make laws for the government and regulation of ships and vessels, the instruments by which this commerce is mainly carried on; to provide the documents by

which their nationality shall be verified, and which shall entitle them to the privileges of American vessels. They become ships and vessels of the United States, and amenable to and under the protection of our laws; and what has a more direct bearing on the present case, congress has enacted laws regulating the contract between ship owners and the men by whom the ships are navigated; their mutual duties and obligations, and providing penalties for the breach of these regulations; establishing, also, rules of police, defining and limiting the powers and authority of officers, and the rights and obligations of seamen. So far as these regulations have been established by acts, they govern. The authority of congress to enact such laws has never been called in question, and moreover the constitution itself has adopted the general maritime law, as it was received and practiced in the country at the time when it was formed, having the same relation to the maritime laws of congress as the common law has to the statute law of the country, where the acts of congress are silent. These laws follow the ship wherever she goes, and do not become inoperative, or a•dead letter, in the whole or in any part of them, when the ship arrives in and is lying within the body of a county. The laws of revenue, of navigation, and of trade, remain in full force and vigor over the ship wherever she floats; nor can I see any reason in law or public policy, why the laws which regulate the internal police of the ship, do not also. If any of the ship's company violate the local laws while lying in a harbor, they may be held amenable to those laws. But for all their acts on board the ship, which have relation to their rights or duties as members of the ship's company, they are responsible to the laws of the United States, and these rights and duties are to be measured by these laws, and not by the local laws of the port, although the vessel may be lying in waters within the body of a county. The laws which regulate the police of a ship are no more struck with a paralysis in passing a county line, than those of revenue and navigation.

I have examined this question of jurisdiction more at length than would seem to be necessary, because I have not met with any reported case where the precise question involved in this has been formally decided; and also, because it was stated at the argument that this question had been decided by the district court of Alabama against the jurisdiction, in a case arising in the same place as this. I have not seen the reasoning by which this decision, if any such has been made, has been vindicated. My own examination has led me to a different conclusion. On the whole, my opinion is that the courts of the United States have jurisdiction over a tort committed by one of the ship's company on another on board of a ship or vessel of the United States while lying in a harbor,

although she may be within the body of a county. I am unable to distinguish this case from others, of collision taking place just as this did, in a harbor, nor do I think it makes any difference whether the harbor be a foreign one or one within this country. The laws of the United States follow the ship while she is engaged in commerce wherever she goes.

. The constitution having adopted the general maritime law of the country, as it existed and was received at the time when it was formed, as the maritime law of the United States, their courts have jurisdiction of such a case as one 'arising under the constitution and laws of the United States.' Whether it be of admiralty or common-law jurisdiction depends on the facts of each particular case. Under the grant of power to regulate commerce, congress has the power to regulate the internal police of vessels by which that commerce is carried on, and if the laws of marine are violated within the waters of a foreign or domestic port, the case is one of admiralty and maritime jurisdiction. The right of the master to enforce obedience to his orders, and to correct the insolent and mutinous conduct of seamen by blows, is not denied. It is an authority that grows out of the necessities of the service. But it is also limited by those necessities. The rightful authority of the master must be upheld, and if a seamen is habitually disrespectful, insolent, and mutinous in his conduct, the execution of this authority will be looked upon with indulgence. But this high power is not to be lightly resorted to on trifling occasions; never are severe blows to be given, unless necessary to enforce prompt obedience in a case of urgency, and to maintain the subordination of the crew. Never are blows to be given with a deadly or dangerous weapon, but in the most extreme cases. In any other, but in cases of the last urgency, it is an indictable offence, and punishable by fine and imprisonment. Act Cong. March 3, 1835 (4 Stat. 776). Nor ought masters to inflict a degrading or humiliating punishment, that would wound the feelings of self-respect of a seaman. The humiliating punishment of seizing up a seaman to the rigging and administering what, in the language of the sea, is technically called a flogging, is specially prohibited by law. 9 Stat. 515. Both these rules were violated in the present case. The knocking a man down with the fist and then kicking him around the deck on the head and shoulders, is a degrading punishment, involving both cruelty and contempt. It is evidently so considered and felt by the seamen, from the name given to this kind of punishment—'booting.' The wounds given to a man's feeling of self-respect. whether a landsman or a seaman, are those that strike deepest into the heart, and rankle with most bitterness, and are, of all, most likely to breed an insubordinate and mutinous disposition, and that will wait for and watch the oppor-

tunity of revenge. The second assault by the mate with a slung-shot, was still more exceptionable. This is certainly a dangerous, and may be, in the hands of a strong man, a deadly weapon. Such a weapon is absolutely prohibited in all cases, except of most extreme necessity, that admit of no delay, as a check to mutiny. The blows, also, were given with great force, as is certain from the wounds inflicted, the quantity of blood that came from them, and the scars that yet remain. And what was the provocation that called down this disgraceful and cruel punishment? If any, it was of the slightest character that can well be imagined. Possibly Roberts answered the mate with a little less courteousness that the conventional rules of behavior on shipboard demanded. And all this is left without mitigation or explanation. From all the evidence, the crew appear to have been uniformly quiet, peaceable, and without any tendency to disorder. Some trouble had existed while the ship lay in the bay waiting for a cargo, on account of the provisions. But this arose from the fault of the master, and from no fault of the crew. They laid their complaints respectfully before the captain, and when they failed to obtain such relief as they had reasonable claims for, they submitted without the smallest appearance of disorder or violence to the discipline of the ship.

I award two hundred dollars jointly against the master and mate, with costs.